UNITED STATES  DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ALVIN DOMINIQUE                          CIVIL ACTION

VERSUS                                   NUMBER: 08-00293

MICHAEL J. ASTRUE,                       SECTION: "S"(5)
COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION


**REPORT AND RECOMMENDATION**


Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2E(B), this matter comes before the Court on the parties' cross-motions for summary judgment[1]/ following a decision of the Commissioner of the Social Security Administration denying plaintiff's applications for Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI") benefits based on disability.  (Rec. docs. 16, 19).

Alvin  Dominique,  plaintiff  herein,  filed  the  subject applications for DIB and SSI benefits on June 8, 2005 alleging

_____

[1]/ The forty-one page memorandum supporting plaintiff's motion for summary judgment was filed without leave of court in violation of Local Rule 7.8.1E (Local Rule 7.7, effective February 1, 2011).

disability as of June 1, 2004. (Tr. pp. 46-48, 348-351).  In a "Disability Report-Appeal" form that was completed by plaintiff on September 15, 2005, the conditions resulting in his inability to work were identified as low back pain and headaches. (Tr. pp. 74-80).  Plaintiff's applications for DIB and SSI benefits were denied at the initial level of the Commissioner's administrative review process on July 13, 2005. (Tr. pp. 42-45). Pursuant to plaintiff's request, a hearing de novo before an Administrative Law Judge ("ALJ") went forward on April 10, 2007 at which plaintiff and a Vocational Expert ("VE") appeared and testified. (Tr. pp. 39, 21, 239).  On August 16, 2007, the ALJ issued a written decision in which he concluded that plaintiff was not disabled within the meaning of the Social Security Act. (Tr. pp. 18-29A).  The Appeals Council ("AC") subsequently denied plaintiff's request for review of the ALJ's decision on November 15, 2007, thus making the ALJ's decision the final decision of the Commissioner. (Tr. pp. 4-6). Plaintiff then sought judicial review of the Commissioner's adverse decision by initiating this lawsuit on January 14, 2008. (Rec. doc. 1).

On April 21, 2008, the Commissioner filed a consent motion to remand plaintiff's case back to the Administration based upon the fact that the recording from the April 10, 2007 hearing was either partially or totally blank. (Rec. doc. 7). Pursuant to that motion,

plaintiff's case was remanded to the Commissioner on April 23, 2008. (Rec. doc. 8). On August 1, 2008, the AC formally vacated the Commissioner's final decision and remanded the matter back to the ALJ for another hearing de novo and a new written decision. (Tr. p. 239). Additional documentary evidence was submitted by both parties. (Tr. pp. 245, et seq.). On January 23, 2009, a hearing before a second ALJ went forward at which plaintiff, who was then represented by counsel, and a VE appeared and testified. (Tr. pp. 353-370). On March 12, 2009, that second ALJ issued a written decision in which plaintiff was again found to be not disabled. (Tr. pp. 214-223). The AC subsequently declined to assume jurisdiction over plaintiff's case on September 4, 2009, thus making the second ALJ's decision the final decision of the Commissioner. (Tr. pp. 200-201). The Commissioner's motion to reinstate this case was granted on March 5, 2010 (rec. doc. 10), and the matter is now ripe for judicial review pursuant to 42 U.S.C. §§405(g) and 1383(c)(3).

In his cross-motion for summary judgment plaintiff frames the issues for judicial review as follows:

    I.   [t]he ALJ failed to accord appropriate weight to the opinions of plaintiff's treating physicians.

    II.  [t]he ALJ failed to properly evaluate the credibility of plaintiff's statements regarding the severity and limiting effects of his pain.

III. [t]he ALJ failed to question the Vocational Expert as to plaintiff's nonexertional impairment, pain.

IV. [t]he ALJ failed to consider plaintiff's obesity at any step in the sequential evaluation.

(Rec. doc. 16-2, pp. 21-22).

Relevant to the issues to be decided by the Court are the following findings made by the ALJ:

1. [t]he claimant meets the insured status requirements of the Social Security Act through June 30, 2009.

2. [t]he claimant has not engaged in substantial gainful activity since June 1, 2004, the alleged onset date (20 CFR 404.1521 et seq., and 416.971 et seq.).

3. [t]he claimant has the following severe impairments: degenerative changes of the cervical and lumbar spine with moderate bilateral C-5 radiculopathy and narcotic medication dependence (20 CFR 404.1521 et seq. and 416.921 et seq.).

4. [t]he claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1526, 404.1527, 416.925 and 416.926).

5. [a]fter careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the full range of light work as defined in 20 CFR 404.1457(b) and 416.967(b).

6. [t]he claimant is capable of performing past relevant work as a photographer. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7. [t]he claimant has not been under a disability, as defined in the Social Security Act, from June 1, 2004 through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

4

(Tr. pp. 219-222).

Judicial review of the Commissioner's decision to deny DIB or SSI benefits is limited under 42 U.S.C. §405(g) to two inquiries: (1) whether substantial evidence of record supports the Commissioner's decision, and (2) whether the decision comports with relevant legal standards. <u>Anthony v. Sullivan</u>, 954 F.2d 289, 292 (5th Cir. 1992); <u>Villa v. Sullivan</u>, 895 F.2d 1019, 1021 (5th Cir. 1990); <u>Fraga v. Bowen</u>, 810 F.2d 1296, 1302 (5th Cir. 1987). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. 42 U.S.C. §405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 91 S.Ct. 1420 (1971). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision. <u>Johnson v. Bowen</u>, 864 F.2d 340, 343-44 (5th Cir. 1988). Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. <u>Jones v. Heckler</u>, 702 F.2d 616, 620 (5th Cir. 1983). The Court may not reweigh the evidence or try the issues <u>de novo</u>, nor may it substitute its judgment for that of the Commissioner. <u>Cook v. Heckler</u>, 750 F.2d 391, 392 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve, not the courts. <u>Patton v. Schweiker</u>, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant seeking DIB or SSI benefits bears the burden of proving that he is disabled within the meaning of the Social Security Act. Harrell v. Bowen, 862 F.2d 471, 475 (5th Cir. 1988). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§423(d)(1)(A) and 1382c(a)(3)(A). Once the claimant carries his initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and is, therefore, not disabled. Harrell, 862 F.2d at 475. In making this determination, the Commissioner utilizes the five-step sequential analysis set forth in 20 C.F.R. §§404.1520 and 416.920, as follows:

1. an individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.

2. an individual who does not have a "severe impairment" will not be found to be disabled.

3. an individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors.

4. if an individual is capable of performing the work that he has done in the past, a finding of "not disabled" must be made.

5. if an individual's impairment precludes him from

performing his past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.

On the first four steps of the analysis, the claimant bears the initial burden of proving that he is disabled and must ultimately demonstrate that he is unable to perform the work that he has done in the past. Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 107 S.Ct. 2287, 2294 n.5 (1987). In determining whether a claimant is capable of performing the work that he has done in the past, the ALJ is required to assess the demands of the prior work and to compare those demands to the claimant's present capabilities. Villa, 895 F.2d at 1022; Hollis v. Bowen, 837 F.2d 1378, 1386 (5th Cir. 1988); Epps v. Harris, 624 F.2d 1267, 1274 (5th Cir. 1980). The assessment of the demands of a claimant's prior work "... may rest on descriptions of past work as actually performed or as generally performed in the national economy." Villa, 895 F.2d at 1022 (citing Jones v. Bowen, 829 F.2d 524, 527 n. 2 (5th Cir. 1987)). A finding that the claimant is disabled or is not disabled at any point in the five-step review process is conclusive and terminates the Commissioner's analysis. Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir. 1987).

As noted above, the second administrative hearing that was held in this case went forward on January 23, 2009. At the outset

of that hearing plaintiff's counsel objected to the admission of two pieces of documentary evidence: a "Physical Residual Functional Capacity Assessment" form for reportedly not being completed by a medical consultant and a consultative evaluation report from Dr. Sweeney because he did not have the benefit of EMG and cervical spine MRI results.  Over counsel's objections, the exhibits were nonetheless admitted into evidence.

Plaintiff then took the stand and was intermittently questioned by his attorney and the ALJ.  When asked about the significance of the alleged onset date of June 1, 2004, plaintiff testified that in 2001, he had been involved in one of a number of accidents going back several years.  The resulting back problems and headaches were initially treated with chiropractic care and later with increasingly frequent dosages of Tramadol to the point where the effectiveness of the drug diminished and affected plaintiff's sleep, ultimately impacting his ability to work weddings, the largest source of income for his photography business. Plaintiff had been scheduled to begin pain management treatment at Charity Hospital but Hurricane Katrina changed that. He had thus begun treatment at a clinic in Homer.  Currently he took MS Contin and Vicodin for pain relief.

Subsequent to the accident in 2001, plaintiff testified that his condition progressively worsened such that the community and

church activities that he once enjoyed could no longer be pursued. Plaintiff testified to daily painful headaches which began in the morning and lasted all day.  Those were treated with ice, hot compresses, and pain medication. Muscle relaxers proved to be ineffective.  Plaintiff then began treatment with Dr. Gervais who suspected involvement at the C5 level and who administered nerve block injections which were effective at first but then diminished over time. The doctor had then considered facet injections but elected to get a neurologist involved for possible nerve stimulation therapy or implantation of a pain medication pump.  In terms of his back, plaintiff testified that the pain began in the lower back, mostly on the left, and that upon being on his feet for any period of time the pain radiated down his legs and into his feet which became numb.  Ever since his last accident, plaintiff testified that the combined effects of headaches and back pain left him unable to concentrate.

Continuing, plaintiff testified that his daily activities primarily consisted of taking his medications, laying on the sofa, and sleeping.  When asked by the ALJ how long he had been taking pain medication plaintiff testified that he first began taking Tramadol approximately a year after an accident that had occurred back in 1991.  Even sitting caused plaintiff's back to hurt and his feet to become numb as they were at the time he was testifying.

When riding in a car plaintiff would have to adjust the seat to a reclining position.  Walking also caused pain to "spike" up his spine. Plaintiff further testified that a therapist had advised him to refrain from performing toe touches or even lifting as it could result in paralysis. However, he admitted that he could lift a gallon of milk and pain, as opposed to strength, was the more limiting factor.  Upon being pressed by the ALJ, plaintiff acknowledged that the advice against lifting was more addressed to lifting heavy objets that would put strain on the affected areas of his body. (Tr. pp. 357-367).

The documentary evidence that was generated during the relevant time period[2] begins with a treatment note from Dr. Charles Mary dated May 11, 2004 when plaintiff was seen for spondylolisthesis. The doctor noted that plaintiff's pain was fairly well-controlled with Ultram and that he was losing weight which was down to 214 pounds.  Plaintiff was to start on test patches for diminished testosterone levels. (Tr. p. 132).  Pursuant

---

[2] As a general rule, an ALJ is required to develop the medical history of an individual seeking DIB or SSI benefits for the twelve month period prior to the month that the application for benefits were filed unless there is reason to believe that development of an earlier period is necessary. 20 C.F.R. §§404.1512(d), 416.912(d).  Here, plaintiff filed his concurrent applications for benefits on June 8, 2005 and alleged a disability onset date of June 1, 2004.  The relevant time period thus begins in May of 2004.

to a referral from Dr. Mary, plaintiff was evaluated by Dr. Claude S. Williams, III of Southern Orthopedic Specialists on July 7, 2004.   Plaintiff's chief complaint was low back pain and he recounted a long history of injuries to his back in the form of numerous automobile accidents, an injury on a fire truck, and a fall from a roof.   An MRI had been done in August of 2002 which showed normal vertebral alignment and no disc herniation or nerve root compression but did reveal some multilevel disc degeneration and bulges.   Plaintiff was working part-time as a photographer at the time.   He complained of pain in the lower back on prolonged standing or after stooping or bending activities with the pain being experienced subsequent to engaging in such activities. Occasionally there was a numbing feeling extending down plaintiff's thighs to his feet.   He also recalled a history of thyroid disease. Medications included Androderm patches, Ultram, and thyroid medication.

On physical examination, plaintiff was in no acute distress and walked without assistance or a limp but he did have diffuse back tenderness.   Plaintiff could bend at the waist and touch his toes, his hips were stable with a normal range of motion, and straight leg raising was negative. Plaintiff could walk on his heels and toes and there was no atrophy in the legs.   X-rays of the lumbar spine demonstrated mild degenerative changes.   Dr. Williams'

11

diagnosis was chronic low back pain, chronic recurrent lumbar strain, multilevel lumbar disc degeneration, and a history of thyroid disease.  Surgery did not appear to be indicated and the doctor discussed conservative treatment options included weight loss, back rehabilitation exercises, over-the-counter non-narcotic analgesics as needed, and lumbosacral support. (Tr. pp. 94-98).

Plaintiff was next seen by Dr. Jack Heidenreich for a check-up on August 16, 2004.  He reported less frequent headaches but was noted to have small testicles and large breast size.  The assessment was hyperlipidemia, hypotesterone, hypothyroid, panhypopituitary, and back pain.  The treatment plan included a referral to Dr. Jimmy Ponder. (Tr. p. 100).

Plaintiff was seen by Dr. Ponder of the Headache & Pain Center on August 23, 2004 in connection with his complaints of low back pain, greater on the left than on the right, which radiated down the legs and into the heels. Plaintiff recounted his lengthy history of accidents, injuries, and treatment which included epidural steroid and local anesthetic injections in 2003 that helped for a short period of time.  EMG/NCV studies that were done on December 6, 2002 were normal for the lower extremities. Plaintiff described his pain as dull and constant that occasionally became intensely sharp and that worsened with movement as well as with sitting or standing too long.  He also experienced numbness,

burning, and tingling, an inability to sleep, and less desire to engage in pleasurable activities.  On the day of the evaluation plaintiff rated his pain as a "7" to "8" on a 10-point scale which was constant, yet fluctuating, relieved with Ultram as needed and cold compresses. When the pain was at its worst, plaintiff had difficulty urinating.  Central neck pain was also complained of secondarily.  In his written report, Dr. Ponder noted that plaintiff had missed quite a bit of work due to pain and had recently sold his business.

On physical examination, deep tendon reflexes were +2 bilaterally for the upper and lower extremities diffusely.  In the neck plaintiff had midline atlantooccipital junction tenderness with palpation.  The lumbar spine had left L4-5 paravertebral tenderness with left lateral flexion but no pain with 15 degrees of lumbar extension or with 90 degrees of lumbar flexion.  Plaintiff had no paravertebral, sciatic notch, or SI joint tenderness. There were no nerve root tension signs to 90 degrees bilaterally; plaintiff's gait was antalgic; and strength was 5/5 in all extremities.  The assessment was the presence of symptoms consistent with lumbar radiculopathy with symptomatic lumbar spondylosis likely complicating plaintiff's low back pain. Cervical radiculopathy and symptomatic cervical spondylosis were the causes of plaintiff's neck pain with a superimposed soft tissue

13

component.  MRI's of the spine were to be ordered, Neurontin was prescribed, and plaintiff was given a series of epidural steroid and local anesthetic injections in the lumbar area with similar treatments to the neck being a possibility in the future as well as the addition of Elavil. (Tr. pp. 100A-102).

Plaintiff was given a refill on his Tramadol on March 23, 2005. (Tr. p. 129).  On April 13, 2005, plaintiff was seen at the Leonard J. Chabert Medical Center ("LJCMC") for complaints of daily, constant headaches with the pain level being a "4".  He also complained of pain to the right elbow.  Ultram was prescribed and a lumbar MRI was ordered. (Tr. pp. 126-128).  Another refill of Tramadol was telephoned in for plaintiff on May 3, 2005. (Tr. p. 125).  On May 4, 2005, plaintiff underwent an MRI of the lumbar spine without contrast. That testing revealed normal vertebral alignment with normal disc height and signal and no evidence of disc herniation or significant spinal canal or neural foraminal narrowing. The impression was no significant interval change since a previous study performed on August 24, 2002 with mild asymmetric bulging at L2-3, lateral protrusion of the disc superimposed on a mild annular bulge at L3-4, and transitional mild right facet degeneration at L5-S1. (Tr. pp. 104-105, 172-173).

Plaintiff requested a further medication refill telephonically on May 13, 2005 (Tr. P. 119).  Then, on May 14, 2005, plaintiff

14

presented himself to the LJCMC emergency room with complaints of lower back pain, at a level of "8", for the previous 2 days as well as headaches, having run out of pain medication.  The diagnosis was chronic low back pain and plaintiff was discharged with medication refills. (Tr. pp. 121-124). Plaintiff returned to Dr. Mary on June 10, 2005 for thyroid medication refills.  Plaintiff's testosterone level was noted to be low.  Prescription refills were given. (Tr. pp. 132, 131).

Pursuant to a referral from Dr. Marmande, plaintiff underwent nerve conduction/EMG studies by Dr. Michael Charlet of the LJCMC Electromyography Department on June 28, 2005.  Prior to the testing plaintiff was noted to have normal strength, 2+ symmetrical deep tendon reflexes, and his back was non-tender to palpation.  The impression was mild chronic partial well-compensated left L5 radiculopathy. (Tr. pp. 169-171).  On that same date, Chiropractor Nicholas J. Arcement corresponded with plaintiff's insurer and recalled having treated plaintiff with intense chiropractic therapy for four months following his automobile accident on November 30, 2001.  The diagnosis was a L-2/L-3 disc bulge, a L3-/L-4 disc protrusion, and a L5/S1 transitional segment with plaintiff experiencing 70% improvement as a result of the therapy.  Plaintiff had then been referred to an orthopedist for more invasive treatment. Not having seen plaintiff since May 24, 2004, Dr.

15

Arcement was unable to comment on his current prognosis. Nevertheless, the doctor opined that plaintiff could sit no longer than 1 hour at a time, could walk no more than 1 mile at a time, could lift/carry/handle nothing heavier than 30 pounds, and was limited to traveling no further than 60 miles. (Tr. pp. 140-141).

On July 6, 2005, plaintiff completed the Administration's "Function Report-Adult" form which elicited information about how his conditions limited his activities. Plaintiff described an average day as primarily involving taking his medication, laying down, and using an ice pack on his back and head. He also did some light chores such as washing clothes, walked around the house or the yard a little, and used an inversion table that he had just obtained. Plaintiff needed no assistance with personal hygiene, prepared microwave-ready foods daily, could drive a car, and grocery shopped once per week for a few items. As a result of his pain, watching TV had become his only interest but he did attend church on Sundays as well as photo club and Knights of Columbus meetings once per month. Plaintiff's pain increased with lifting, squatting, bending, standing, walking, and sitting. (Tr. pp. 66-73).

On July 12, 2005, an Administration disability examiner reviewed plaintiff's file as it was then extant and set forth his findings in a "Physical Residual Functional Capacity Assessment"

16

form.   There,   the   examiner   indicated   that   plaintiff   could occasionally lift and/or carry 20 pounds and could frequently lift and/or carry 10 pounds; could sit, stand, and/or walk for 6 hours per 8-hour workday; had an unlimited ability to push and/or pull; and, had no postural, manipulative, visual, communicative, or environmental  limitations.    The  examiner  noted  that,  because plaintiff's chiropractor had referred him to an orthopedist on May 24, 2004 and because plaintiff had not followed up on the referral, his condition was thus not as limiting as he claimed it to be. Although plaintiff's back was bothersome, the disability examiner opined that it would not preclude plaintiff from performing his past work as he had described it. (Tr. pp. 142-149).

Plaintiff was seen at the LJCMC Internal Medicine/Family Practice Clinic on August 2, 2005 for complaints of daily headaches with pain at a level of "5".   The diagnosis included chronic back syndrome, hypertension, and L5 radiculopathy. (Tr. pp. 164-168). Hepatitis testing done on August 22, 2005 was negative. (Tr. p. 163). Plaintiff completed the Administration's "Disability Report-Appeal" form on September 15, 2005 indicating therein that on May 1, 2005 his low back pain and headaches had increased, that his hands and forearms felt swollen and painful making grasping objects difficult, and that his feet got hot and felt swollen.   Problems with his feet required him to lay down even more; riding in a

vehicle increased back and leg pain; headaches prohibited most activities; and the Zanaflex and Elavil that he was taking precluded him from driving. (Tr. pp. 74-80).

Plaintiff returned to LJCMC on September 18, 2005 for follow-up evaluation.  His back pain had decreased but he still suffered from headaches, swelling in the hands, and a sensation that his feet felt like they were on fire.  The diagnosis again included chronic back syndrome, hypertension, and L5 radiculopathy. (Tr. pp. 160-162). Bloodwork that was done on January 18, 2006 produced abnormal ALT results and high triglycerides. (Tr. pp. 155-156).  A brain CT scan without contrast enhancement that was performed on February 9, 2006 was negative. (Tr. pp. 154).  Despite being on Androderm patches, plaintiff's testosterone was low on May 2, 2006, his ALT level was elevated, swelling was present in the right knee, he suffered from early morning headaches, and his blood pressure was up. (Tr. pp. 151-153).  When plaintiff was next seen by Dr. Mary on July 7, 2006, he reported that he was experiencing more headaches than back pain.  The assessment was hypertension, chronic back pain, and headaches.  Medication refills were given. (Tr. p. 174).  As of July 26, 2006, plaintiff's medications consisted of Tramadol, Armour Thyroid, Androderm, Hydrocodone, and Carisoprodol. (Tr. p. 88).

Plaintiff was seen at LJCMC on October 11, 2006 and reported

18

not feeling well for several weeks with headaches, intermittent back pain, and bilateral knee pain.  Plaintiff reported that on August 27, 2006, he had experienced an episode of his head spinning while working on his car.  The diagnosis was hypertension, hypertriglycerides, and elevated LFT's.  (Tr. pp. 182-184). Plaintiff still had an elevated ALT level as demonstrated through bloodwork that was performed on October 12, 2006. (Tr. Pp. 185-186).  On November 13, 2006, a counselor with Louisiana Rehabilitation Services corresponded with plaintiff to advise him that he had met the basic eligibility criteria for vocational rehabilitation services and had been placed in "Selection Group IV."  Although that group pertained to individuals who were "significantly disabled", it was but one of a total of five groups with individuals in Group I having the most severe disabilities. Plaintiff was invited to set up an appointment to discuss formation of an individualized plan for employment, including an employment goal specific to him.  (Tr. pp. 188-190).

On December 13, 2006, plaintiff was evaluated at the LJCMC Neurology Clinic for his complaints of headaches and progressively worsening back pain since his auto accident five years earlier. The back pain radiated to the back of the thighs and plaintiff had occasional numbness and tingling from the knees to the feet and numbness and tingling to the hands.  Pain was elicited upon

19

palpation of the occipital region. The impression was neck/occipital pain, hand numbness, and chronic low back pain. A pain management consultation was to be obtained which included the possibility of trigger point injections. (Tr. pp. 179-180). Plaintiff was seen again at LJCMC on January 12, 2007 and the diagnosis was headaches, chronic back pain, and hypertension. Medication was prescribed and plaintiff was to return to the clinic in four months. (Tr. pp. 175-177). On January 19, 2007, plaintiff presented himself to the Mary Medical Clinic for medication refills on his Soma, Ultram, and Oxycontin. (Tr. pp. 336-337). A further refill for Oxycontin was authorized by Dr. Mary on March 23, 2007. (Tr. p. 335). Yet another refill for that medication was given to plaintiff on May 8, 2007. (Tr. p. 334).

On June 5, 2007, a consultative evaluation of plaintiff was performed by Dr. John Sweeney, an orthopedist. Presenting complaints included low back pain which radiated into and down the back of the left leg. Plaintiff described the pain as severe and unresponsive to most of the treatment he had received and he advised the doctor that he had not worked in 3 years. Neck discomfort was present but was less of an issue than his back and he also had some problems with his left arm. Frequent headaches, dizziness, and decreased vision were also noted. A physical examination of the neck and upper extremities was normal as was a

neurological examination of the upper extremities.  There were no muscle spasms in the lumbar spine, straight leg raising was negative, and plaintiff was able to stand on his heels and toes and to tandem walk.  Gait and station were normal; plaintiff had a full range of lumbar motion; and there were no neurological deficits in the upper or lower extremities.  As part of his evaluation, Dr. Sweeney reviewed various records including those from LJCMC, Dr. Williams, and MRI reports.  The impression was chronic low back pain with relatively new onset of chronic neck pain.  The multiple MRI scans and testing revealed multilevel degenerative changes of a mild nature with a mild radiculopathy noted on electrical studies.  Plaintiff had been determined to be a non-surgical candidate and the objective studies regarding his legs and back failed to show objective pathology so as to fully explain his chronic pain.  X-rays of the lumbar spine showed mild multilevel degenerative changes but those from the cervical spine were normal. Dr. Sweeney opined that is was not in plaintiff's ".....best interest to perform heavy manual labor, although most other occupations are not contraindicated."  (Tr. pp. 191-193).

In conjunction with his consultative evaluation of plaintiff, Dr. Sweeney completed the Administration's standardized form denominated "Medical Source Statement of Ability To Do Work - Related Activities (Physical)."  There, the doctor checked off the

appropriate boxes on the form to indicate that plaintiff could occasionally lift up to 50 pounds and could continuously lift up to 20 pounds; could occasionally carry up to 50 pounds, frequently carry up to 20 pounds, and could continuously carry up to 10 pounds; could sit, stand, and/or walk for 8 hours without interruption or in an 8-hour workday; could continuously use both hands and feet; could occasionally stoop and crouch, frequently climb, balance, and crawl, and could continuously kneel; had no impairments of vision or hearing; had no environmental limitations; and, could engage in various activities such as shopping, travel without a companion and via public transportation, prepare meals, care for his own personal hygiene, and sort, handle, and use paper/files. (Tr. pp. 194-199).

On June 8, 2007, Dr. Mary gave plaintiff a refill on his Oxycodone. (Tr. p. 333). On July 9, 2007, refills for Tramadol and Oxycodone were authorized. (Tr. p. 332). An additional refill of Oxycodone was authorized on August 5, 2007. (Tr. p. 331). Plaintiff returned to Dr. Heidenreich on August 29, 2007 with complaints of ongoing morning headaches and chronic back pain. Plaintiff was noted to move without difficulty, could sit on the examination table, and had negative straight leg raising. Mild cervical tenderness was present but with full range of motion. The assessment was cervical and lumbar spondylolysis, sleep apnea, and

morning headaches.  Plaintiff was given a refill of Oxycontin and a sleep study was to be scheduled.  (Tr. p. 257).

Plaintiff returned to Dr. Mary on October 15, 2007 and reported that his pain was getting worse.  Duragesic had provided plaintiff with no relief so he was given prescriptions for MS Contin and Vicodin.  (Tr. pp. 336, 330).  Around that same date two long-time friends and business associates of plaintiff's authored letters indicating that plaintiff had slowed down after his accident in 2001 and that he had attended few, if any, photography-related events in the previous 2 years despite being given free membership and admission.  (Tr. pp. 14, 15).

On December 12, 2007, pursuant to a referral from Dr. Mary, plaintiff was evaluated by Dr. Donald Gervais of the Southeast Neuroscience Center.  Plaintiff continued to complain of chronic neck and back pain with pain in the right buttock greater than the left and achiness in the arms, particularly in the dorsal aspect of both forearms.  Dr. Gervais recalled the progression of plaintiff's medication treatment and remarked that he was doing "fine" on a regimen of MS Contin.  Plaintiff admitted to experiencing tingling/numbness in his legs and hands but there was no loss of balance or muscle weakness. On physical examination, plaintiff had tenderness in the scapular area and in the right buttock area but no visible spasms were noted and straight leg raising was negative.

There was some mild weakness on the right but muscle tone was normal throughout with no atrophy. X-rays of the lumbar spine revealed mild degenerative changes and x-rays of the cervical spine revealed calcifications within the C4-5 disc anteriorly. Dr. Gervais also reviewed MRI results from 2002 which showed L5-S1 stenosis. Further EMG studies that were performed demonstrated moderately severe bilateral C5 radiculopathies as well as L5 radiculopathies but no evidence of neuropathy. Plaintiff was to be started on Lyrica which, if proven to be ineffective, was to be followed up with an MRI of the cervical spine and brain. (Tr. pp. 267-280, 286).

Additional MS Contin was prescribed by Dr. Mary on December 21, 2007. (Tr. p. 329). Plaintiff was seen again by Dr. Gervais on January 11, 2008 for complaints of occipital tenderness with secondary headaches, waking up with headaches everyday. He had tried Lyrica but it had only worsened his headaches and increased fluid and weight gain. Medications at the time consisted of Armour Thyroid, Hydrocodone, Morphine, Soma, and Androderm patches. Plaintiff's neck was supple with a free range of motion but he did have tenderness in the scapular area and in the right buttock area. No visible spasms were noted. The impression was: 1) elevated LFT's probably related to medications but not fully explained; 2) occipital neuralgia with headaches; 3) cervicogenic neck pain with

24

C5 radiculopathies; 4) low back pain with mild lumbar radiculopathies; and, 5) possible obstructive sleep apnea. Plaintiff was to receive a trial of Marcaine injections to both greater occipital nerves and trigger point injections in the trapezius muscles to treat the tenderness and muscle spasm. (Tr. pp. 264-266).

In conjunction with his evaluation of plaintiff on that day, Dr. Gervais also completed a "Physical Capacity Evaluation (PCE)" form that had been provided to him by plaintiff's attorney. There, Dr. Gervais indicated that plaintiff could stand less than 2 hours, walk less than 1 hour, and sit less than 3 hours per 8-hour workday; could occasionally lift/carry less than 10 pounds but could lift no weight on a frequent basis; could use his hands for repetitive grasping/handling and fine manipulation/fingering but not for pushing and pulling; could not use his feet for repetitive movements; could never climb or perform various postural maneuvers; but, could reach above shoulder level. The foregoing limitations were attributable to neck and low back pain and plaintiff suffered from C5 radicular changes with secondary cervicogenic headaches. Dr. Gervais checked off additional blanks on the form to indicate that plaintiff had a marked limitation in his ability to perform activity within a schedule, to maintain regular attendance, and to be punctual with customary tolerance; had a marked impairment in

his ability to complete a normal workday and work-week without interruptions from medically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and, was able to tolerate a moderate level of stress. (Tr. pp. 248-250).

On January 23, 2008, plaintiff was given refills for Vicodin ES and MS Contin by Dr. Mary. (Tr. p. 328). On January 25, 2008, Dr. Mary completed a PCE form like the one that had been completed by Dr. Gervais several weeks earlier. Indeed, not only was the form the same but the findings set forth by Dr. Mary were essentially identical to the ones that had been recorded by Dr. Gervais. (Tr. pp. 343-345). Additional refills of MS Contin were authorized by Dr. Mary on February 25, 2008 and April 1, 2008. (Tr. pp. 327, 325). Plaintiff was next seen by Dr. Gervais on April 3, 2008 and reported that the trigger point injections were helpful but that he had to discontinue use of Keppra after having some headaches that were worsening. Plaintiff still had some tenderness in the scapular and right buttock areas but straight leg raising was negative and no visible spasms were noted. He also had some mild APB, EDB, and EHL weakness, the right greater than the left. Plaintiff had an antalgic gait, decreased sensation in both median nerve distributions and in both L5 distributions, and decreased vibration in the right great toe. The impression was

26

cervicogenic headaches, neck pain with C5 radicular changes, and low back pain.  Plaintiff was to be placed on a trial course of a TENS Unit, the dosage of Keppra was to be increased, and other possible pain modalities were discussed.  (Tr. pp. 261-263).

Plaintiff's prescription for MS Contin was renewed by Dr. Mary on May 1, 2008 and an additional refill for Vicodin ES was authorized on May 9, 2008.  (Tr. pp. 326, 323).  A further refill on the MS Contin was given on May 29, 2008.   (Tr. p. 324). Plaintiff was seen by Dr. Mary on June 16, 2008 and reported that his pain was still not controlled despite being on MS Contin and Vicodin for some time.  The dosage of MS Contin was to be increased and concerns over depression were noted.   The assessment was chronic back pain and depression and plaintiff was prescribed Armour Thyroid, Prozac and Androderm patches.  (Tr. pp. 319-322).

On June 17, 2008, plaintiff received occipital nerve block and trigger point injections at the hands of Dr. Gervais which were tolerated well.   Pending the resolution of some cost issues, plaintiff was to be fitted for a TENS Unit as soon as possible. (Tr. p. 260).  A refill on plaintiff's Oxycontin was authorized by Dr. Mary on June 26, 2008.  (Tr. p. 314).  Plaintiff returned to Dr. Heidenreich on June 27, 2008 for a check-up and labwork.  He reported feeling well and indicated that his prescribed medications were helping.   The assessment was back pain, neuropathies,

hypertension, and hypogonadism.   (Tr. pp. 252-256, 315-318).
Plaintiff was next seen by Dr. Gervais on July 10, 2008 who
administered another series of occipital nerve block and trigger
point injections with the indication for the procedure being
identified as occipital neuralgia.  (Tr. Pp. 259).

Plaintiff presented himself at the Mary Medical Clinic on July
28, 2008 to pick up his prescription refill for Oxycontin.   (Tr.
pp. 312-313).  A refill for Vicodin ES was authorized by Dr. Mary
on August 27, 2008 and refills for Xanax and Oxycontin were written
on August 28, 2008 with plaintiff expressing a desire to reduce the
dosage of the Oxycontin to 40 milligrams.   (Tr. pp. 311, 310).
More Oxycontin was prescribed on October 10, 2008.  (Tr. p. 303).

On October 16, 2008, plaintiff was seen again by Dr. Gervais
and reported problems sleeping at night.  Plaintiff indicated that
his greatest problem was his neck pain which radiated into the
occipital areas bilaterally, and a pulling sensation and constant
pressure to the back of the neck.  However, he also reported that
the Xanax recently prescribed by Dr. Mary did relax him a great
deal, that the occipital nerve block injections he had received in
July had provided good relief for a few weeks, and that the TENS
Unit was helpful.  Medications at the time included Oxycontin,
Xanax, Hydrocodone, Benicar/HCTZ, Armour Thyroid, Soma, and
Angioderm.  On physical examination, plaintiff's neck was supple

with a free range of motion.  However, he had exquisite tenderness
to the occipital areas bilaterally with visible trigger points in
the cervical paraspinous musculature and a previously unseen
pulling motion to his posterior neck causing some retropulsion.
Sensation was the same as the previous visit.  The impression was
occipital neuralgia, possible torticollis, cervicogenic headaches,
and chronic cervical and lumbar pain.  In his report, Dr. Gervais
remarked that plaintiff's symptoms had evolved into more of a
movement disorder with significant cervical spasm.  A trial of
botulinum toxin therapy was considered, Amrix was to be substituted
for Soma, and further injections into both occipital nerves were to
be scheduled.  (Tr. pp. 297-299).

       An updated consultative evaluation was performed on plaintiff
by Dr. Sweeney on October 28, 2008.  Plaintiff complained of pain
to his entire body, at a level of "7", with the exception of a
small portion of his anterior trunk.  On physical examination,
plaintiff's neck was normal as were the upper extremities.
Cervical spine motion was full and unrestricted.  Forward flexion
of the lumbar spine could be accomplished to 30 degrees, extension
to 20 degrees, and right and left lateral flexion to 10 degrees
with no muscle spasm or external signs of pathology.  The lower
extremities had symmetry in the thighs and calves with a normal
neurological examination.  Plaintiff's gait was unremarkable; he

was able to tandem walk; and he was also able to stand and walk on his toes and heels.   X-rays of the lumbar spine were similarly unremarkable.   Dr. Sweeney's impression was chronic pain with plaintiff's subjective complaints exceeding the objective findings and with probable narcotic analgesic dependency.   Dr. Sweeney made no change in his assessment of plaintiff's physical capabilities as compared with the previous evaluation of June 5, 2007, noting that plaintiff "...is not impaired for most occupations with perhaps the exception of heavy manual labor."   (Tr. pp. 245-246).

Plaintiff received Botox injections from Dr. Gervais on October 30, 2008 to treat cervical spasms associated with torticollis.   (Tr. p. 296).   He received further occipital nerve blocks on November 6, 2008 as the previous ones had been very helpful.   (Tr. p. 295).   On November 20, 2008, plaintiff returned to Dr. Gervais and reported that the most recent nerve blocks were beneficial but that the effects had worn off.   Plaintiff had exquisite tenderness over the occipital areas bilaterally and he did have inducible headaches on palpation of the occipital area. Sensation was the same as the previous visit.   The impression was occipital neuralgia.   Occipital nerve blocks were repeated with the hope of providing plaintiff sustained relief.   (Tr. pp. 292-294).

On November 24, 2008, plaintiff returned to Dr. Mary for medication refills and reported that the Botox injections from Dr.

Gervais had not been effective.  The assessment was chronic back pain and cervical strain.  (Tr. pp. 301-302).  Later that same day, plaintiff underwent an MRI of the cervical spine.  That testing revealed mild narrowing of the central spinal canal at C3-4 with mild bilateral neural foraminal narrowing at C3-4.  (Tr. pp. 290-291).

Overall, there was no dramatic improvement to plaintiff's condition when he was next seen by Dr. Gervais on December 4, 2008. Plaintiff complained of achiness in the high occipital area as well as the high cervical paraspinous musculature and predominantly left lumbar paraspinous musculature.  The symptoms in plaintiff's low back had now gone to both sides of his lumbar spine and activity made his symptoms worse.  Plaintiff experienced arm pain when holding a phone to his ear.  On physical examination, plaintiff had tenderness in the high occipital area bilaterally, pain on neck flexion, and tenderness in the left lumbar paraspinous musculature with palpable trigger points noted in the trapezius, levator scapulae, cervical paraspinous musculature, and lumbar paraspinous musculature.  Plaintiff had an antalgic gait and sensation was unchanged from the previous visit.  Dr. Gervais interpreted the results of the recent MRI as revealing C3-4 bilateral neuroforaminal stenosis that was moderately severe, the right greater than the left, with some facet arthropathy.  The impression

was cervical radiculopathy, occipital neuralgia with cervicogenic headaches, lumbar pain with lumbar radicular syndrome, hypothyroidism, spasmodic torticollis, and lumbar radicular disease. Dr. Gervais observed that plaintiff's symptoms had been only partially responsive to treatment thus far and plaintiff's progressive symptomatology was becoming a concern in light of the abnormalities in the cervical area. In lieu of further occipital nerve blocks, cervical facet blocks and/or neuroforaminal nerve root blocks at the C3, C4, and C5 levels were to be scheduled in January. (Tr. pp. 287-289).

Plaintiff underwent further diagnostic testing of the lumbar spine on December 10, 2008 in the form of an MRI and x-rays. The latter study demonstrated mild transitional instability at L4-5; pelvic calcifications which may represent phlebolitis; a transitional vertebra denoted at S1; and, a rudimentary disc at S1-2 with six non-rib-bearing lumbar vertebra. MRI testing revealed a transitional lumbosacral segment denoted S-1 after comparison with the plain film radiographs; mild narrowing of the central spinal canal at L4-5; bilateral facet arthropathy at multiple levels; and, no evidence of neural foraminal narrowing. (Tr. pp. 282-285).

Yet another follow-up visit with Dr. Gervais went forward on December 23, 2008. The doctor noted that the testing to date had

32

revealed small bulges at L4-L5 and L5-S1 but not enough to justify surgical intervention with similar symptoms being present in the neck.  Plaintiff described almost constant achiness in the buttock area down the legs and leg numbness when standing for prolonged periods of time with increased pain a day or two following activity.  Plaintiff continued to receive prescriptions for pain medication only from Dr. Mary with whom he had a "pain contract", with Dr. Gervais noting that he furnished no controlled substances to plaintiff.  Plaintiff also had intrascapular pain with significant cervicogenic headache symptoms which caused significant depression.  Pain relief modalities had been unavailing and plaintiff was willing to try almost anything.  Medications remained as MS Contin, Vicodin, Xanax, Henicar, Armour Thyroid, Soma, and Androderm.  Musculoskeletal findings were the same as from the previous visit as was sensation.  Dr. Gervais recalled the testing that had been performed on December 10, 2008 which revealed L4-L5 changes that were relatively mild and no spondylolisthesis in the lumbar spine.  An MRI of the cervical spine that was done on November 24, 2008 demonstrated C3-4 bilateral neuroforaminal stenosis that was moderately severe, the right greater than the left, and some facet arthropathy.  The impression was chronic low back pain and neck pain.  Plaintiff was to be referred to Dr. Phillip McAllister for possible spinal cord stimulation for his

33

neck and/or back as well as a possible intrathecal morphine trial. (Tr. pp. 339-341).

The final treatment note appearing in the record documents plaintiff's follow-up evaluation with Dr. Mary on January 7, 2009 with the chief complaint being pain in the lumbar spine. Plaintiff was now having trouble initiating a urine flow, the Xanax was not working as well, and there was tenderness to palpation of the lumbar spine. The impression was lumbago. Plaintiff was given refills on his medications and was to follow-up with Dr. Smith, a neurosurgeon. (Tr. p. 347).

As noted earlier, plaintiff challenges the Commissioner's decision to deny him Social Security benefits on four separate grounds. In the first of those, plaintiff alleges the ALJ failed to accord appropriate weight to the opinions of his treating physicians. Plaintiff alleges that the ALJ improperly gave full weight to the opinions of the Commissioner's disability examiner and consultative physician, Dr. Sweeney, while giving no weight and not even mentioning the opinions of his treating physicians, Doctors Mary and Gervais, contrary to relevant legal standards.

The law is clear that the ALJ has the sole responsibility for determining a claimant's disability status and is free to reject the opinion of <u>any</u> physician when the evidence supports a contrary conclusion. <u>Newton v. Apfel</u>, 209 F.3d 448, 455 (5th Cir.

2000)(quoting Paul v. Shalala, 29 F.3d 208, 211 (5th Cir. 1994), overruled in part on other grounds by Sims v. Apfel, 530 U.S. 103, 120 S.Ct. 2080 (2000)). A treating physician's opinions are not conclusive and may be assigned little or no weight when good cause is shown. Newton, 209 F.3d at 456 (citing Brown v. Apfel, 192 F.3d 492, 500 (5th Cir. 1999) and Greenspan v. Shalala, 38 F.3d 232, 237 (5th Cir. 1994), cert. denied, 514 U.S. 1120, 115 S.Ct. 1984 (1995)). Good cause exists when the treating physician's opinions are so brief and conclusory that they lack persuasive weight, when they are not supported by medically acceptable techniques, or when the evidence supports a different conclusion. Newton, 209 F.3d at 456; Bradley v. Bowen, 809 F.2d 1054, 1057 (5th Cir. 1987); Scott v. Heckler, 770 F.2d 482, 485 (5th Cir. 1985). The Regulations require the ALJ to perform a detailed analysis of a treating physician's view under the criteria set forth in 20 C.F.R. §§404.1527(d) and 416.927(d) only in the absence of controverting medical evidence from other treating and/or examining physicians. Newton, 209 F.3d at 453.

Contrary to plaintiff's present assertions, although the ALJ's discussion may not have been as thorough as it could have, the ALJ did indeed mention and discuss the opinions of both Doctors Mary and Gervais in his written decision. (Tr. pp. 219-220). After describing the LJCMC medical records, the ALJ turned to those of

35

Dr. Mary, noting that he had treated plaintiff for multiple issues between August 1, 2002 through January 7, 2009 and had prescribed a number of pain medications throughout this time period. (Id.). The ALJ then discussed the results of the PCE form Dr. Mary completed on January 25, 2008. (Tr. p. 220). However, Dr. Mary had not seen plaintiff on that date, his most recent evaluation having occurred several months earlier on October 15, 2007. (Tr. p. 336). The treatment note authored on the latter date, however, was scant indeed, with Dr. Mary recording only that plaintiff's pain at that time was getting worse, that Duragesic had been ineffective, that plaintiff had thus far been denied Social Security benefits, and mentioning various other pain medications. (Tr. p. 336). MS Contin and Vicodin were prescribed on that date. (Tr. p. 330). The treatment note contained no discussion of or restrictions on plaintiff's activities. As for the subsequently-completed PCE form itself, it was unaccompanied by any contemporaneously-recorded, medically acceptable findings and is thus entitled to little weight on that basis alone. Warncke v. Harris, 619 F.2d 412, 417 (5th Cir. 1980).

Next, the ALJ turned to the records of Dr. Ponder who saw plaintiff on August 23, 2004 for complaints of radiating low back pain associated with a series of accidents going back a number of years, the most recent one being in 2001. Although plaintiff had

by that time begun missing work and had sold his photography
business, he was apparently able to work despite his symptoms
between the dates of the accident and the alleged onset date.  See,
e.g., Villa, 895 F.2d at 1024.  EMG/NCV studies that had been done
in December of 2002 were normal for the lower extremities.  While
plaintiff described his pain on the day of the evaluation as fairly
significant, he also reported that it was relieved with Ultram as
needed and with cold compresses.  A condition that can reasonably
be controlled with medication and treatment is not disabling.
Lovelace, 831 F.2d at 59.[3]/ Upon physical examination, plaintiff's
sensation was intact in all extremities and strength was normal
throughout.   The  assessment  included  lumbar  and  cervical
radiculopathies with resulting symptoms.   Additional diagnostic
testing was to be ordered, Neurontin was prescribed, and steroid
and anesthetic injections were administered to the lumbar area.
Those modalities apparently provided plaintiff with some degree of
relief as he received no additional treatment over the next seven
months at which time he simply requested a refill on his Tramadol.
See, e.g. Villa, 895 F.2d at 1024.  The following month, plaintiff
was seen at LJCMC for daily headaches at a pain level of "4" and

_____

[3]/ The Court notes that plaintiff had previously seen Dr. Mary
for spondylolisthesis on May 11, 2004 at which time he also
reported that his pain was fairly well-controlled with Ultram.

right elbow pain. Ultram was prescribed.  Another Tramadol refill was authorized on May 3, 2005 and the MRI that was performed the following day revealed only mild bulging and degeneration at various levels.

The Court recalls that plaintiff came to be referred to Dr. Ponder by Dr. Heidenreich whom he had seen for a check-up on August 23, 2004 and to whom he had reported a decrease in his headaches. Prior to that, plaintiff had seen Dr. Williams for complaints of low back pain on July 7, 2004 at a time when plaintiff was still working, albeit part-time.  Mild degenerative changes were noted on current x-rays and based upon an August 2002 MRI which revealed normal vertebral alignment and no disc herniation or nerve root compression.  While plaintiff did have back tenderness, he could bend at the waist and touch his toes, straight leg raising was negative, and there was no atrophy in the legs.  Surgery was not indicated and the conservative treatment measures that were discussed only included weight loss, back exercises, over-the-counter non-narcotic analgesics as needed, and lumbosacral support.

After discussing Dr. Ponder's medical records, the ALJ turned to those of Dr. Arcement who rendered chiropractic treatment to plaintiff at various times between November 30, 2001 and May 24, 2004.  Notwithstanding not having seen plaintiff since the latter date and purporting to be unable to comment on plaintiff's current

prognosis, the doctor nevertheless opined that plaintiff could sit for 1 hour at a time, could walk for 1 mile at a time, could lift/carry/handle up to 30 pounds, and could travel up to 60 miles at a time.  Although Dr. Arcement's opinions, as a chiropractor, are technically entitled to little weight, 20 C.F.R. §§404.1513(a) and 416.913(a), his opinions were largely consistent with the performance of light work activity.   20 C.F.R. §§404.1567(b), 416.967(b).

Next came the mention of Dr. Gervais' records which was admittedly brief with the ALJ noting only that plaintiff had been under his care from December 12, 2007 through December 23, 2008 for longstanding complaints of cervical and lumbar pain and headaches. On the former date, plaintiff complained of chronic neck and back pain and achiness in the arms. The doctor characterized plaintiff as doing "fine" on his medication regimen and, while there was tenderness to the scapular area and right buttock, there were no spasms and straight leg raising was negative.   Lumbar x-rays revealed only mild degenerative changes and cervical x-rays demonstrated calcifications within the C4-5 disc.  EMG studies showed moderately severe bilateral C5 radiculopathies as well as L5 radiculopathies but no evidence of neuropathy.  The only treatment prescribed was Lyrica and no restrictions were placed on plaintiff's activities.

After obtaining a refill on his MS Contin on December 21, 2007, plaintiff was seen by Dr. Gervais for the second time on January 11, 2008 for complaints of occipital tenderness with daily secondary headaches. Plaintiff had a free range of motion to the neck but he did have tenderness in the right scapular and right buttock areas. The diagnosis was elevated LFT's, thought to be medication-related, occipital neuralgia with headaches, cervicogenic neck pain with C5 radiculopathies, low back pain with mild lumbar radiculopathies, and possible sleep apnea. Marcaine and trigger point injections were to be administered. In connection with that second evaluation, Dr. Gervais completed a PCE form like the one that would subsequently be done by Dr. Mary, indicating therein that plaintiff could stand less than 2 hours, could walk less than 1 hour, could sit less than 3 hours per 8-hour workday, could occasionally lift/carry less than 10 pounds but could lift no weight whatsoever on a frequent basis, could not use his hands for pushing/pulling nor his feet for repetitive movements, and could never climb or perform various postural maneuvers. With no corresponding mention in either of the 2 treatment notes that he had generated 1 month apart, Dr. Gervais additionally indicated that plaintiff had marked limitations in his ability to maintain a regular schedule and attendance and to complete a normal work-week without interruptions from medically-

40

based symptoms or to perform at a consistent pace without an unreasonable number and length of rest periods.

In the meantime, plaintiff had been consultatively evaluated by Dr. Sweeney on June 5, 2007 for complaints of low back, hand, leg, and arm pain.  As part of that evaluation, Dr. Sweeney reviewed a plethora of medical records that had been generated at LJCMC, a brain CT SCAN, EMG and nerve conduction studies, MRI's of the lumbar spine, and the reports issued by the Louisiana Rehabilitative Services and Dr. Williams.  Plaintiff had a full range of motion to the neck and upper extremities and a neurological exam of those areas was normal.  The lumbar spine appeared normal with a full range of motion and with no muscle spasm and straight leg raising was negative.  Plaintiff was able to stand on his heels and toes and to tandem walk and his gait and station were unremarkable; reflexes were normal, and there were no neurological deficits in the lower extremities.  The impression was chronic low back pain with relatively new onset of chronic neck pain.  The objective testing revealed multilevel degenerative changes of only a mild nature with mild radiculopathy.  Dr. Sweeney noted that plaintiff had been determined to be a non-surgical candidate and the objective evidence simply did not support the extensive nature of plaintiff's subjective complaints.  Although plaintiff was precluded from performing heavy manual labor, most

41

other occupations were not contraindicated.

In connection with his thorough evaluation, Dr. Sweeney provided a Medical Source Statement regarding plaintiff's activities, finding that he could occasionally lift/carry up to 50 pounds and could continuously lift up to 20 pounds; could frequently carry up to 20 pounds and could continuously carry up to 10 pounds; could sit/stand/walk for 8 hours without interruption and over the course of an 8-hour workday; could continuously use his upper extremities and feet for a variety of activities; could occasionally stoop and crouch, frequently climb, balance, and crawl, and could continuously kneel; had no hearing or vision impairments; could continuously be exposed to environmental conditions; and, could perform a range of normal daily activities.

Dr. Sweeney would subsequently re-evaluate plaintiff on October 28, 2008, once again reviewing a large volume of medical records including those from Doctors Ponder and Mary. Upon physical examination, plaintiff's neck was normal as were the upper extremities. Cervical spine motion was full and unrestricted and an exam of the lumbar spine revealed that plaintiff could forward flex to 30 degrees, extend 20 degrees, and laterally flex to 10 degrees with no muscle spasm or external signs of pathology. The lower extremities were symmetrical with a normal neurological exam; reflexes were intact and equal; plaintiff's gait was unremarkable;

and he was able to tandem walk and to stand and walk on his toes and heels.  X-rays of the lumbar spine were unremarkable.  The impression was chronic pain, with plaintiff's subjective complaints far exceeding the objective findings that had been made by multiple physicians.  Once again, Dr. Sweeney believed that plaintiff would only be limited from performing heavy manual labor.  Dr. Gervais himself would subsequently note on December 23, 2008 that x-rays and lumbar MRI results from December 10, 2008 revealed only mild changes and small bulges at L4-5 and L5-S1 but no spondylolisthesis.  Dr. Gervais further noted then in plaintiff's medical history that he was not a candidate for surgical intervention.

Faced with the competing medical evidence that was before him, the ALJ found Dr. Sweeney's opinions to be more well-supported and thorough than those of the other physicians who had treated plaintiff.  The opinions of treating physicians are not, as a matter of law, entitled to greater weight than those of consulting physicians, Adams v. Bowen, 833 F.2d 509, 512 (5th Cir. 1987), and given the deference to which the ALJ's findings are entitled the Court is unable to say that he erred here.  The Court again notes that no physician, treating or otherwise, has ever suggested that plaintiff is a candidate for surgical intervention.  Further, the ALJ did not so much discount the medical findings of Doctors Mary

43

and Gervais because he did not find that the plaintiff did not have back and neck problems.  What he discounted was those doctors' opinions as to plaintiff's residual functional capacity because those opinions did not comport with the objective tests in the record.

In his second challenge to the Commissioner's decision, plaintiff argues that the ALJ failed to properly evaluate the credibility of his statements regarding the severity and limiting effects of his pain.

The law is clear than an ALJ must consider a claimant's subjective complaints of pain.  Scharlow v. Schweiker, 655 F.2d 645, 648 (5th Cir. 1981).  However, it is within the ALJ's discretion to determine its debilitating nature.  Jones v. Bowen, 829 F.2d 524, 527 (5th Cir. 1987).  Pain is considered disabling within the meaning of the Social Security Act only when it is "constant, unremitting, and wholly unresponsive to therapeutic treatment."  Hames v. Heckler, 707 F.2d 162, 166 (5th Cir. 1983).  The burden is upon the plaintiff to produce objective medical evidence of a condition that could reasonably be expected to produce the level of pain or other symptoms complained of.  Selders v. Sullivan, 914 F.2d 614, 618 (5th Cir. 1990); Harper v. Sullivan, 887 F.2d 92, 96 (5th Cir. 1989).  The ALJ must then weigh the plaintiff's subjective testimony against the objective medical

44

evidence that has been produced. <u>Chaparro v. Bowen</u>, 815 F.2d 1008, 1010 (5th Cir. 1987) (citing <u>Jones</u>, 702 F.2d at 621 n.4). The ALJ may discredit a plaintiff's subjective complaints of pain and attendant physical limitations if he carefully weighs the objective evidence and articulates specific reasons for doing so. <u>Anderson v. Sullivan</u>, 887 F.2d 630, 633 (5th Cir. 1989)(citing <u>Abshire v. Bowen</u>, 848 F.2d 638, 642 (5th Cir. 1988)). It must be remembered that the evaluation of a plaintiff's subjective complaints is a task particularly within the province of ALJ for it was the ALJ who had an opportunity to observe the plaintiff, not the Court. <u>Harrell</u>, 862 F.2d at 480. Furthermore, the mere existence of pain or the fact that an individual is unable to work without experiencing pain is not an automatic ground for obtaining disability benefits. <u>Owens v. Heckler</u>, 770 F.2d 1276, 1281 (5th Cir. 1985)(citing <u>Jones</u>, 702 F.2d at 621 n. 4). In the final analysis, the responsibility of weighing the evidence and determining the credibility of witnesses' testimony and doctors' opinions lies with the ALJ in the first instance. <u>Carrier v. Sullivan</u>, 944 F.2d 243, 247 (5th Cir. 1991); <u>Greigo v. Sullivan</u>, 940 F.2d 942, 945 (5th Cir. 1991); <u>Wren v. Sullivan</u>, 925 F.2d 123, 129 (5th Cir. 1991); <u>Moore v. Sullivan</u>, 919 F.2d 901, 905 (5th Cir. 1990).

In his written decision of March 12, 2009, the ALJ discussed

plaintiff's medical records that were generated at LJCMC between August of 2002 through January of 2007 including the May 4, 2005 MRI findings showing mild degeneration at L5-S1 and EMG results consistent with left-sided L5 radiculopathy. (Tr. p. 219). Also discussed by the ALJ, admittedly in varying degrees of detail, were the treatment records of Dr. Mary, Dr. Ponder, Dr. Arcement, and Dr. Gervais. (Tr. pp. 219-220). Plaintiff's hearing testimony was then summarized following which the ALJ made his third-step finding that plaintiff did not suffer from an impairment or combination of impairments that satisfied the criteria of any of those set forth in the Listing of Impairments. (Tr. pp. 220-221). Having so found, the Regulations then mandated that the ALJ make an assessment of plaintiff's residual functional capacity which is defined as what the claimant can still do in spite of his impairments and resulting limitations. 20 C.F.R. §§404.1520(e), 404.1545, 416.920(e), 416.945.

In making his residual functional capacity assessment, the ALJ found that plaintiff's testimony and subjective complaints were only partially credible when weighed against the objective evidence of record as a whole. (Tr. p. 221). While acknowledging that the objective evidence revealed that plaintiff suffered from degenerative changes of the cervical and lumbar spine with moderate bilateral C5 radiculopathy, he discounted plaintiff's complaints of

46

leg numbness with sitting and an inability to stand and walk as a result of pain to the degree and frequency testified to by plaintiff as lacking such objective support.  Similarly, the ALJ found that plaintiff's testimony regarding an inability to concentrate due to pain was a symptom that had never been recorded by any medical provider. (<u>Id</u>.).  As was discussed above in connection with the Court's resolution of plaintiff's first challenge, the ALJ was faced with medical opinion at one end of the spectrum from Doctors Mary and Gervais, generated just weeks apart, that plaintiff was essentially unable to perform any work-related activities whatsoever on a sustained basis to opinion at the other end of the spectrum, based primarily on the opinions of Dr. Sweeney that were rendered nearly seventeen months apart, that plaintiff was only precluded from performing heavy manual labor.  Presented with such divergent views, the ALJ concluded that plaintiff suffered from impairments that could reasonably be expected to produce symptomology but simply not to the extent that they prevented the performance of light-level work.

When seen by Dr. Williams on July 7, 2004, plaintiff could bend at the waist and touch his toes, straight leg raising was negative, and there was no atrophy of the thighs or legs.  On August 23, 2004, Dr. Ponder noted intact sensation in both the upper and lower extremities, and strength was 5/5 throughout.  Dr.

Sweeney reported on June 5, 2007, some three years past the alleged onset date, that plaintiff had a full range of motion of the lumbar spine with no muscle spasm, that the circumferences of the calves and thighs were nearly identical, and that there were no neurological deficits of the upper or lower extremities. And when plaintiff was reevaluated by Dr. Sweeney on October 28, 2008, plaintiff had full and unrestricted motion of the cervical spine, no muscle spasm to the lumbar spine, symmetry and normal neurological signs in the thighs and calves, and an unremarkable gait. Although Dr. Gervais reported on December 4, 2008 that plaintiff had decreased sensation in both the median nerve and L5 distributions, he also found that plaintiff had normal muscle tone, mass, strength, and reflexes. The absence of such objective indicators indicative of the existence of completely debilitating pain may be properly considered by the ALJ in evaluating a claimant's disability status. Adams, 833 F.2d at 512. Subjective testimony and complaints do not take precedence over objective medical evidence. That was essentially the reason that the ALJ gave plaintiff's testimony the weight that he did. That fulfills his duty here. Godbolt v. Apfel, 1999 WL 179476 at *9 (E.D. La. March 31, 1999)(citing Falco v. Shalala, 27 F.3d 160, 164 (5th Cir. 1994)). See also Augustine v. Barnhart, 2002 WL 927797 at *4 (E.D. La. May 7, 2002); Collins v. Callahan, 1998 WL 118082 at *3-4 (E.D.

48

La. March 17, 1998).  Finally, the fact that the Louisiana Rehabilitation Services determined that plaintiff was eligible for vocational rehabilitation services is not binding upon the Commissioner.  20 C.F.R. §§404.1504, 416.904.  Further, that state program appears geared to placing people back into the work force.

Plaintiff's third claim for relief is that the ALJ erred in failing to question the VE regarding plaintiff's non-exertional impairment of pain.

The law is clear that the determination of whether a claimant can perform his past work, a determination on which plaintiff bears the burden of proof at step four of the five-step sequential evaluation process, can be made by an ALJ without even receiving vocational testimony.  <u>Laurent v. Astrue</u>, 2009 WL 959463 at *11 (E.D. La. March 26, 2009)(citing <u>Williams v. Califano</u>, 590 F.2d 1332, 1334 (5th Cir. 1979); <u>Gray v. Sec. of Health, Education and Welfare</u>, 421 F.2d 638, 639 (5th Cir. 1970); <u>Torres v. Harris</u>, 502 F.Supp. 518, 524 (E.D. Pa. 1980)).  If an ALJ elects to utilize the Services of a VE at an administrative hearing, any hypothetical questions that are posed to the VE need only reasonably incorporate those disabilities of the claimant which are recognized by the ALJ. <u>Bowling v. Shalala</u>, 36 F.3d 431, 436 (5th Cir. 1994).

In addressing plaintiff's third challenge, the Court first notes that plaintiff never identified any non-exertional

impairments such as pain as disabling conditions, in and of
themselves, in his applications for Social Security benefits and
supporting paperwork.  See Pierre v. Sullivan, 884 F.2d 799, 802
(5th Cir. 1989).  At the administrative hearing, the ALJ called upon
the VE only to testify to the exertional and skill demands of
plaintiff's past work. (Tr. pp. 367-368).  The ALJ posed no
hypothetical questions to the VE that spoke to any limitations
resulting from any of plaintiff's impairments. (Id.).  The VE was
duly tendered to plaintiff's counsel for further questioning but no
suggestions or questions regarding the specific effect of pain on
his ability to work were asked. (Tr. pp. 368-369).  See Bowling, 36
F.3d at 436.  As discussed above, while Dr. Sweeney opined on two
separate occasions that plaintiff was only precluded from
performing heavy physical labor, the ALJ ultimately concluded that
plaintiff only had the residual functional to do light work,
finding his testimony of limitations due to pain only partially
credible. (Tr. pp. 221-222).  Plaintiff's complaints regarding the
limiting effects of his pain were deemed to be credible only to the
extent that they were consistent with the ALJ's residual functional
capacity assessment. (Tr. p. 222).  On July 6, 2005, which was one
year past the alleged onset date of disability, plaintiff reported
that he could still perform light chores, prepare meals, walk
outside, shop, and drive.  The ALJ may properly consider such

reports in determining a claimant's disability status.  Vaughn v. Shalala, 58 F.3d 129, 131 (5th Cir. 1995).  Plaintiff also indicated that he attended church once per week and attended photography club and Knights of Columbus meetings once per month. (Tr. pp. 66-73). The ability to perform such activities is not indicative of a level of pain preclusive of all work activities.  See Anderson, 887 F.2d at 632; Chaparro, 815 F.2d at 1010.  See also Leggett v. Chater, 67 F.3d 558, 565 n. 12 (5th Cir. 1995).

In his fourth and final challenge to the Commissioner's decision, plaintiff alleges that the ALJ failed to consider his obesity at any step of the five-step sequential evaluation process. In support of this argument, plaintiff cites Social Security Ruling 02-1p which vests the Commissioner with discretion to contact a medical source to clarify whether a claimant is obese even in the absence of a diagnosis of obesity or other medical records pointing to that possibility.  While a diagnosis of obesity given by a physician is generally accepted, it is not binding and may be refuted by evidence indicating that the diagnosis is questionable. (Id.).  The Ruling further goes on to state, "[h]owever, [that] in most cases we will use our judgment to establish the presence of obesity based on the medical findings and other evidence in the case record ..."  SSR-1p, 2000 WL 628049 at *3 (Sept. 12, 2002). Given the possibility of its effect on other impairments, including

those in the musculoskeletal system, obesity should be considered in the sequential evaluation process, including when assessing an individual's residual functional capacity.   20 C.F.R., Pt. 404, Subpt. P., App. 1, Section 1.00(Q).

As far as the record reflects, none of plaintiff's treating physicians ever diagnosed him with obesity as a disabling condition.   The Court also notes that plaintiff never identified obesity itself as a disabling impairment in his applications for benefits or related paperwork.   Pierre, 884 F.2d at 802.   Be that as it may, plaintiff cites weights ranging from 214 pounds on May 11, 2004 to 239 pounds on December 23, 2008, a variance of some twenty-five pounds over a 4.5 year period. (Rec. doc. 16-2, p. 39). On July 20, 2003, approximately a year before the alleged onset date, plaintiff's weight was recorded as 221.2 pounds yet he was apparently able to work at that time despite his size.   Johnson, 864 F.2d at 347-48.

Alternatively, plaintiff argues that Section 1.00(Q) of the Listing of Impairments recognizes that the effects of obesity can lead to and often complicate conditions such as musculoskeletal disorders and that the ALJ erred in failing to evaluate whether plaintiff met the criteria of Listing 1.04.   Of the three subsections of Listing 1.04, the closest one that would arguably apply to plaintiff would be Section 1.04(A) which provides that an

individual will be deemed to be disabled if he suffers from:

> 1.04 *Disorders of the spine* (e.g. herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

The plaintiff bears the burden of proving that he satisfies all of the criteria of a particular Listing of Impairments. Selders, 914 F.2d at 619 (citing Sullivan v. Zebley, 493 U.S. 521, 110 S.Ct. 885 (1990)). For present purposes, suffice it to say that there is an absence of evidence of positive straight-leg raising tests in both the sitting and supine positions as the final portion of Listing 1.04(A) requires.

Finally, plaintiff argues that the ALJ's residual functional capacity assessment was made without considering his obesity. As discussed above, Dr. Sweeney on two separate occasions declared that plaintiff was only precluded from performing heavy manual labor. The ALJ, however, assessed plaintiff as being capable of

neither heavy nor medium-level work but capable of performing light-level work.  Such a finding adequately accounts for any additional limitations resulting from plaintiff's alleged obesity. Owing to his finding that plaintiff possibly suffered from narcotic medication dependence, the ALJ did evaluate whether said condition satisfied the criteria of Section 12.04 and 12.09 of the adult mental disorder listings.  That satisfies his obligations at the third step of the sequential evaluation process.

<u>**RECOMMENDATION**</u>

For the foregoing reasons, it is recommended that plaintiff's motion for summary judgment be denied and that defendant's motion for summary judgment be granted.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within fourteen days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  <u>Douglass v. United Services Auto. Assoc.</u>, 79 F.3d 1415 (5th Cir. 1996)(<u>en banc</u>).

New Orleans, Louisiana, this _2nd_ day of _____March_____,
2011.

54

ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE